IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID H. PEASE, III and LISA PEASE  )
)
       Plaintiffs,               )
)
)
v.                             )     CIVIL ACT. NO. 2:07cv340-ID
)
MAIN TURBO SYSTEMS, KELLY     )
AEROSPACE, INC., d/b/a KELLY      )
AEROSPACE POWER SYSTEMS, INC.,  )
LYCOMING ENGINES, et al.,        )
)
       Defendants.           )
)

**PLAINTIFFS' REQUEST FOR PERMISSION TO CONDUCT LIMITED
JURISDICTIONAL DISCOVERY AND FOR AN EXTENSION OF TIME TO
RESPOND TO DEFENDANT MAIN TURBO'S MOTION TO DISMISS**

COME NOW Plaintiffs David H. Pease, III and Lisa Pease by and through

undersigned counsel moving in response to this Court's Order to Show Cause dated July

18, 2007 for permission to conduct specific and limited jurisdictional discovery on the

issue of whether Alabama Courts have personal jurisdiction over defendant Main Turbo

Systems and for an extension of time to respond to Main Turbo's motion until the

completion of such discovery. In support hereof plaintiffs state as follows:

On April 20, 2007 plaintiffs filed their complaint against defendants Main Turbo

Systems, Inc., Kelly Aerospace, Inc., d/b/a Aerospace Power Systems, Inc., and

Lycoming Engines. Both Kelly Aerospace, Inc., d/b/a Aerospace Power Systems, Inc.,

and Lycoming Engines answered plaintiffs' complaint shortly thereafter.

In lieu of answer Main Turbo Systems filed a motion to dismiss on July 13, 2007

contending that this Court's exercise of personal jurisdiction was unwarranted in light of

Main Turbo's "*de minimus* contacts with Alabama" and its "sporadic and attenuated business contacts within the state." (See Doc. 12-1, <u>Defendant Main Turbo Systems, Inc.'s Motion To Dismiss</u>, p. 8) Charging that Main Turbo has no presence in Alabama and that haling it into court there would offend Due Process, defendant's motion is solely supported by the unverified affidavit of Main Turbo's owner, Gary L. Main.

Importantly, Main Turbo incorporates new and unsubstantiated facts not previously in the pleadings. Given the factually intensive analysis necessary to counter Main Turbo's motion, plaintiffs respectfully request that limited jurisdictional discovery occur before this matter is deemed fully briefed by plaintiffs. In fact, upon receipt of Main Turbo's motion, plaintiffs propounded written discovery on the issue and requested the opportunity to depose Main Turbo's affiant, Gary L. Main.[1] As an initial matter then, plaintiffs respectfully request jurisdictional discovery take place; that Main Turbo be ordered to answer the propounded discovery and that plaintiffs be given the opportunity to formally respond to Main Turbo's motion within ten (10) days of the transcription of Mr. Main's deposition testimony.

Nevertheless, without the benefit of jurisdictional discovery, plaintiffs are constrained to point out several deficiencies in Main Turbo's motion to dismiss. In its motion, Main Turbo rather conspicuously oversimplifies its relationship with Alabama by focusing only on the allegedly limited revenues derived from the state six (6) months before the subject crash. Instead, the personal jurisdiction analysis involves examining both the quality and quantity of contacts with Alabama, to which Main Turbo's revenue from Alabama customers six (6) months prior to the subject crash is just one facet. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 122, 107 S.Ct. 1026 (1987)

[1] (*See* Exhibit "A" attached hereto Skinner-Hooper correspondence dated July 17, 2007).

2

(Stevens, J., concurring in part and concurring the judgment) (suggesting that the value and volume of defendant's sales over a period of years affects the purposeful availment determination); *Ex parte Pope Chevrolet Inc.,* 555 So.2d 109, 113-114 (1989) (Finding that minimum contacts existed despite the fact that only one-tenth of one percent of defendant's income was derived from Alabama residents).

Jurisdictional discovery pertaining to Main Turbo, especially in light of its relationship with Kelly Aerospace, is likely to reveal both continuous and systematic contacts with the state of Alabama. Kelly Aerospace, Inc. is headquartered in Montgomery, Alabama. In 1997, Kelly Aerospace purchased the AiResearch and RAJAY turbochargers product lines from Allied Signal.[2] Significantly, on its website, the only services Main Turbo Systems advertises are for AiResearch and RAJAY turbochargers.[3]

When Main Turbo performed the overhaul in question, the service tag expressly stated that the component was completely overhauled in accordance with the manufacturer's specifications. This is consistent with FAA requirements and as such, since 1997, which was before the subject turbocharger was manufactured, the sole source of manufacturer specifications for the sole income producing activity of Main Turbo was from Kelly Aerospace in Alabama.

Consequently, Main Turbo would not only have had continuous and systematic contracts with the state of Alabama, but it would be required to have them by the FAA. Main Turbo would be required to maintain current revision status on Kelly turbocharger overhaul manuals and would presumably have had to pay for this service.

---

[2] (See Exhibit "B" attached hereto, http://www.kellyaerospace.com/turbos.htm and http://www.kellyaerospace.com/articles/KA_Turbocharger.pdf p.3)
[3] (See Exhibit "C" attached hereto, <http://www.mainturbo.com/index.html >)

Contrary to Main Turbo's contention that it "receives parts from Aviall, an aftermarket parts distributor in Dallas, Texas" parts would have also been purchased directly from Kelly during identifiable time periods. (*See* Doc. 12-1, Defendant Main Turbo's Motion to Dismiss, p.3) Ultimately, it is unlikely that an overhaul facility that focuses on one product and one specialty device did not over time purchase parts from the manufacturer of that one product. Defendant's motion does not in any way foreclose upon this possibility. Instead, the time period for which it states that it received parts from Aviall is unspecified.

Additionally, during Main Turbo's overhauls there would be certain parts that cannot be repaired but must be replaced with new parts. Main Turbo would be required to purchase these parts from Kelly Aerospace. The likelihood is that the overhaul and servicing of only AiResearch and RAJAY turbochargers as its sole source of income, there were thousands of parts ordered from Kelly Aerospace and that this stream of purchasing parts from the state of Alabama continues to the present day.

Discovery on jurisdictional issues will permit plaintiffs to fully ascertain the nature and quality of Main Turbo's contacts with Alabama and if these contacts are sustained to suffice personal jurisdiction over defendant there. As this Court is well aware, courts ruling on jurisdictional challenges freely permit discovery before ruling on a motion to dismiss, especially where no discovery has occurred. *Chudasuma v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997) ("Resolution of a pretrial motion that turns on findings of fact- for example, a motion to dismiss for lack of personal jurisdiction may require some limited discovery before a meaningful ruling can be made."); *In re: Magnetic Audiotape Antitrust Litigation, et al.,* 334 F.3d 204, 208 (2d Cir.

2003) (Reversing district court dismissal on lack of personal jurisdiction, finding that it was premature to grant dismissal prior to allowing discovery on plaintiffs' insufficiently developed allegations).

In both federal and Alabama state courts there are two types of *in personam* jurisdiction and a party's contacts are assessed as follows:

> Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to general personal jurisdiction, consist of the defendant's contacts with the forum state that are unrelated to the cause of action and that are both 'continuous and systematic'***Specific contacts, which give rise to specific jurisdiction, consist of defendant's contacts with the forum state that are related to the cause of action***Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state***

*Ex Parte LaGrone*, 839 So.2d 624-25 (2002) (citations omitted)

Determining whether there are sufficient contacts between Main Turbo and the state of Alabama requires a two-step analysis. First, the Court examines the type of contacts and then decides whether there are other circumstances that would render it unreasonable for the out-of-state defendant to defend the action in Alabama.

With respect to the quality of contacts, "[a] nonresident defendant may be subject to Alabama's general *in personam jurisdiction* if its contacts with the State, although unrelated to the cause of action are "continuous and systematic." *LaGrone*, 839 So. 2d at 627. Indeed, where general personal jurisdiction exists, the absence of a clear nexus between the acts of the defendant and the charges in the complaint necessary to support specific *in personam* jurisdiction is rendered immaterial. *Id.*

5

Under Alabama law, "only contacts occurring prior to the event causing the litigation may be considered in determining whether a trial court may exercise personal jurisidiction over a party consistent with the Due Process clause." *Novak v. Benn*, 896 So.2d 513, 521 (Ala. 2004), *quoting Elliot v. Van Kleef*, 830 So.2d 726, 731 (Ala. 2002). Accordingly, only a six (6) month period before the subject crash is used for defendant's conclusion that Main Turbo does limited business in Alabama.

Given the untested facts contained in Mr. Main's affidavit plaintiffs respectfully request the deposition of Mr. Main and an answer to the attached written discovery before formally responding to defendant's motion to dismiss.[4] Without this limited jurisdictional discovery concerning the nature, quality and quantity of Main Turbo's contacts with Alabama, plaintiffs are greatly disadvantaged.

Accordingly, plaintiffs seek an order permitting a period in which such limited jurisdictional discovery shall take place prior to submitting a formal response to Main Turbo's motion to dismiss on the basis of lack of personal jurisdiction.

---

[4] (*See* Exhibit "A" attached hereto).

Respectfully submitted on this the 31st Day of August.


NOLAN LAW GROUP


/s/ Jerome L. Skinner, Esq.
One of the Attorneys for Plaintiffs


OF COUNSEL:

Jerome L. Skinner, Esq.
Nolan Law Group
3074 Madison Road
Cincinnati, Ohio 45209

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing in the above referenced case on the 31st day of July, 2007 by filing the same electronically with the Clerk of the Court using the CM/ECF system which will send notification of the same to all attorneys of record.

/s/ Jerome L. Skinner
OF COUNSEL

Thomas R. Edwards, Esq.
Thomas Edwards, P.C.
8244 Old Federal Road
Montgomery, AL 36117
tedwards2@mindspring.com

Charles B. Paterson, Esq.
Kelly F. Pate, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL 36101-0078
cpaterson@balch.com
kpate@balch.com

Christopher S. Rogers, Esq.
Huie Fernambueq Stewart, LLP
Three Protective Center
2801 Highway 280 South, Suite 200
Birmingham, AL 35223-2484
csr@hfsllp.com

Sanford G. Hooper
Lightfoot Frankin & White, LLC
The Clark Building
400 North 20th St.
Birmingham, AL 35203

# EXHIBIT "A"



**NOLAN LAW GROUP**



20 NORTH CLARK 30TH FLOOR CHICAGO, ILLINOIS 60602 • P 312.630.4000 • F 312.630.4011 • TF 888.630.9340
3074 MADISON ROAD CINCINNATI, OHIO 45209 • P 513.533.2026 • F 513.721.2301
WWW.NOLAN-LAW.COM • CONTACT@NOLAN-LAW.COM

July 17, 2007

Sanford G. Hooper
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 North 20th St.
Birmingham, Alabama 35203

*Via facsimile and
regular mail*

Re:    **Pease v. Main Turbo Systems, et al.**
       **Civil Action No.:  2:07-CV-340-ID**
       **Our File No.:  05084**

Dear Mr. Hooper:

Plaintiff is in receipt of your client, Main Turbo System's Motion to Dismiss. This motion asserts substantial factual information which is unverified and not supported by the documents from which it was obtained.  Consequently, please find attached a limited set of interrogatories and document requests addressing issues arising out of the motion alone.  At your earliest convenience, please consult with your client and get back to me with respect to the following procedural requests:

1.    Plaintiff may pursue limited discovery before filing a response to the defendant's motion to dismiss;

2.    That discovery will include responses to the attached written requests in the first instance;

3.    Following defendant's responses to the written interrogatories and document requests, plaintiff requests the deposition of defendant's affiant, Gary Main at a time and place convenient to counsel and Mr. Main; and

ADMITTED IN ILLINOIS:
DONALD J. NOLAN • WILLIAM J. JOVAN • JAMES H. LAWLOR • PAUL R. BORTH • THOMAS P. ROUTH • THOMAS V. LYONS
KENNETH R. NIX • MOLLIE E. O'BRIEN • JOHN J. LOWREY (Of Counsel) • CHARLES R. BARNETT (Of Counsel)
ADMITTED IN OHIO: JEROME L. SKINNER    •    ADMITTED IN NORTH CAROLINA: JAMES T. CROUSE
ADMITTED IN NEW YORK: WELSON T. CHU    •    ADMITTED IN WASHINGTON, DC: JAMES E. HALL (Of Counsel)



Page Two (2)
Sanford Hooper

July 17, 2007
Re:     Pease

4.     Following the completion and transcription of Mr. Main's deposition, plaintiff will have an additional ten (10) days to respond to the motion to dismiss.

In the event that your client will not agree to the requested discovery and extension of response time, please consider this correspondence as the beginning of the "meet and confer" process. Accordingly, Plaintiff may file a motion for a protective order and for discovery. Please advise by mid-day on Thursday, July 19, 2007 concerning whether or not you will agree to this process.

When you get a chance, give my regards to Banks Sewell.

Very truly yours,

NOLAN LAW GROUP

Jerome L. Skinner

Enclosure

cc:     Thomas Edwards, Esq.
        Christopher Rogers, Esq.
        Charles B. Paterson, Esq.

JLS/jam

FILE COPY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| DAVID H. PEASE, III and LISA PEASE, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 2:07-CV-340-ID |
| | ) | |
| v. | ) | |
| | ) | |
| MAIN TURBO SYSTEMS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST SET OF COMBINED INTERROGATORIES AND DOCUMENT REQUEST TO THE DEFENDANT MAIN TURBO ON ISSUES RELATED SOLELY TO THE DEFENDANT'S MOTION TO DISMISS

NOW COME the plaintiffs DAVID H. PEASE, III, and LISA PEASE, by and through their attorneys, Nolan Law Group, and hereby submit their First Set of Combined Interrogatories and Document Request to the Defendant Main Turbo on Issues Related Solely to the Defendant's Motion to Dismiss:

1.    Please state the accounting basis utilized by the defendant Main Turbo as of June 2005.  In other words, as of June 2005, was Main Turbo accounting for its revenues on a calendar year or fiscal year basis?

**ANSWER:**

2.    If the answer to the above interrogatory was "fiscal year" please state the to month and year designation for that fiscal year.

**ANSWER:**

3.    Please identify the manufacturers of all turbo chargers repaired, overhauled, or otherwise serviced by the defendant Main Turbo:

a.    During the time period between January 1, 2005 and July 1, 2005; and

b.    The last calendar year or fiscal year accounted for prior to the accident in June of 2005.

1

**ANSWER:**

    4.    Please identify each turbo charger repaired, overhauled, or otherwise serviced by the defendant Main Turbo during the time period between January 1, 2005 and July 1, 2005 by manufacturer, serial number, part number, aircraft type and state of customer location.

**ANSWER:**

    5.    Please provide copies of the work orders, repair cards, and customer invoices for the six (6) Alabama customers identified by the defendant on pg. 3 of its Motion and Memorandum to Dismiss.

**ANSWER:**

    6.    Please produce copies of the work orders, repair cards, and customer invoices for all Alabama customers identified by the defendant to have sought services during the last fiscal year or entire calendar year preceding the accident in June of 2005.

**ANSWER:**

    7.    Please produce copies of all work orders, repair cards, invoices and payment records and other written documentation of any kind in the defendant's possession which specifically relate to the repair and overhaul of the "Pease" turbo charger in June 2005.

**ANSWER:**

    8.    Please produce copies of all document utilized as sources by the defendant to prepare the statement which is found on pg. 3 of the defendant's motion and memorandum, "Main Turbo charged approximately $18,765.58 for all of the orders it received from those Alabama customers since January 2005. Id. The $18,765.58 in revenues received from these six customers accounted for less than one half of one (1) percent of the revenues generated by Main Turbo during the same time period. Id." [See Motion and Memorandum to Dismiss, pg. 3, ¶ 3]

**ANSWER:**

    9.    For the time period of June 1, 2004 through July 1, 2005, produce all written records of transactions beginning with repair orders for turbo charger services offered by the defendant Main Turbo to Alabama customers.

**ANSWER:**

10.    Please state, by the same method used to calculate revenues by the defendant on pg. 3, ¶ 3 of its motion and memorandum for the time period of January 2005 through July 2005, the calculated revenues for services rendered to Alabama customers during each of the five (5) preceding fiscal or calendar years as accounted for by Main Turbo. For example, that would include five (5) full fiscal years preceding the fiscal year including June 2005 or the calendar years 2000. 2001, 2002, 2003 and 2004.

**ANSWER:**
11.    Main Turbo has stated beginning in the last line of page two (2) of its Motion and Memorandum to Dismiss that it has no direct business or contractual relationship with Kelly Aerospace Inc. ("Kelly"). Please state or produce the following:

a.    The time period referred to in the above quoted statement.

b.    Kelly's definition of "no direct business or contractual relationship."

c.    Whether any business or indirect contractual relationship has existed between Main Turbo and Kelly in any of the five (5) preceding fiscal years or calendar years before the accident.

d.    Please produce copies of any and all contracts, agreements, correspondence, or other evidence of ongoing or one time business relations or contractual relations between def Main Turbo and Kelly during the preceding five (5) full fiscal or calendar years before the accident.

**ANSWER:**

12.    If any or all of the documents requested in any interrogatory or request as set forth above exists in an electronic format please identify the document, the format in which it is maintained and produce copies of each document in the format of its maintenance.

**ANSWER:**

Respectfully submitted,

BY:  _____ (MED)
Jerome L. Skinner
Attorney for the Plaintiff
3074 Madison Rd.
Cincinnati, OH 45209
(513) 721-1350

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2007, I served the following attorneys of record via U.S. Mail by placing same in the mailbox located on 20 N. Clark St., Chicago, IL 60602:

Sanford G. Hooper, Esq.
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 North 20th St.
Birmingham, Alabama 35203

Charles B. Paterson, Esq.
Kelly F. Pate, Esq.
Balch & Bingham LLP
PO Box 78
Montgomery, Alabama 36101

Thomas R. Edwards, Esq.
Thomas Edwards, PC
8244 Old Federal Road
Montgomery, AL 36117

Christopher S. Rogers, Esq.
Huie Fernambucq Stewart, LLP
Three Protective Center
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223

_____ /MEO
Jerome L. Skinner

************ -COMM. JOURNAL- ****************** DATE JUL-17-2007 ***** TIME 16:51 ********

MODE = MEMORY TRANSMISSION                    START=JUL-17 16:50    END=JUL-17 16:51

FILE NO.=104

| STN NO. | COMM. | ABBR NO. | STATION NAME/TEL NO. | PAGES | DURATION |
|---------|-------|----------|----------------------|-------|----------|
| 001 | OK | ☎ | 12055810799 | 007/007 | 00:00:56 |

-NOLAN LAW GROUP                    -

*********************************** -        - ***** --            - *********



NOLAN LAW GROUP

20 NORTH CLARK 30TH FLOOR, CHICAGO, ILLINOIS 60602  •  P 312.630.4000  •  F 312.630.4011  •  TF 888.630.9340

3074 MADISON ROAD, CINCINNATI, OHIO 45209  •  P 513.533.2026  •  F 513.721.2301

WWW.NOLAN-LAW.COM  •  CONTACT@NOLAN-LAW.COM

# F A C S I M I L E

Date: _7/17/07_

Pages to follow: _6_

To: _Sanford Hooper_

Company: _Lightfoot Franklin & White_

Fax Number: _205.581.0799_

From: _Jerome Skinner_

RE: _Pease v. Main Turbo et al_

COMMENTS:

---

This facsimile may contain PRIVILEGED AND/OR CONFIDENTIAL INFORMATION intended only for the use of the addressee. If you are not the addressee, or the person responsible for delivering it to the person addressed, you may not copy or deliver this to anyone else. If you received this facsimile by mistake, please immediately notify us by telephone. If any problems result with this transmission, please contact the person listed above. Thank you.

ADMITTED IN ILLINOIS:

DONALD J. NOLAN  •  WILLIAM J. JOVAN  •  JAMES H. LAWLOR, III  •  ORLA M. BRADY  •  THOMAS V. LYONS  •  KENNETH R. NIX  •  MICHAEL S. McGRORY
ADMITTED IN OHIO: JEROME L. SKINNER  •  OF COUNSEL: JOHN J. LOWREY  •  CHARLES R. BARNETT, III

# EXHIBIT "B"

Subscribe to Newsletter:

# POWER SYSTEMS

## Turbochargers



Here at Kelly Aerospace, we are constantly expanding ⊂
lines to meet the ever changing needs of the aviation ir
purchase of the RAJAY and Garrett turbochargers, pres:
valves, wastegates, and controllers makes us your best
both new and rebuilt turbocharging systems for all the
aviation aircraft flying today.

- → Factory New, OEM Approved
- → Rebuilt to Factory New Tolerances
- → Performance alloys that resist cracking
- → One year unlimited hours warranty

**CLICK HERE TO FIND YOUR LOC**

## Valves & Controls



- → Kelly Aerospace Factory New & Rebuilt Valves &
  (Previously Garrett)
- → FAA/PMA Replacement Parts

**CLICK HERE TO FIND YOUR LOC**

Home • About Us • News • Technical Articles • Price Lists • Careers • Distributors • Contact • Service Bulletins

©2006 Kelly Aerospace Inc. All Rights Reserved

# AIRCRAFT
# Maintenance
## TECHNOLOGY

### The Leading Publication For The Professional Maintenance Team

Reprinted with permission from *Aircraft Maintenance Technology*, October 1997.

## ACCESSORY TECHNOLOGY



# The Kelly Aerospace Turbocharger

By Randy Knuteson

*Completely disassembled turbocharger. The entire unit can be torn down with a pair of snap ring pliers and common boxed end wrenches.*

Kelly Aerospace 1997

**T**urbocharging an aircraft engine is analogous to a mountain climber making the demanding ascent of Mount Everest aided by supplemental oxygen. Without such help, each advancing step becomes slower and more difficult. Oxygen deprivation slowly saps the strength as every breath of air becomes more labored than the last. A satisfying gulp of bottled oxygen quickly renews the energy required to gain higher ground.

It is the same with a naturally aspirated engine. As a pilot nurses his plane toward its service ceiling, performance diminishes noticeably. Like the climber, the plane is now running "short of breath." However, if you turbocharge that same engine, it will respond as if infused by some high altitude adrenaline. This force feeding of oxygen not only doubles the plane's potential ceiling, but also allows it to climb out from sea-level to 12,000 feet in nearly half the time.

KA031003

# ACCESSORY TECHNOLOGY

The installation of turbochargers enables a plane to climb to new "summits" without monumental effort. Maximum cruise speed increases steadily due to reduced air resistance at these new heights. With the same given power, every 1,000 feet of altitude now yields an additional 2 kts. An increase of 30 plus miles per hour from sea level to 22,000 feet is not at all uncommon.

There are two flights that heavily underscore the value of a turbo retrofit. The first flight occurred some 32 years ago when Lt. Commander Marvin Smith, Jr. successfully piloted a Riley turbocharged Cessna 210A to 40,300 feet. At that time, Commander Smith's flight exceeded the altitude record held by the Japanese since 1959. The second flight, that again dramatizes the increased capabilities appreciated by turbocharging a light aircraft, saw a Piper Twin Commanche fly from California to Pennsylvania on one tur-

> *. . . force feeding of oxygen not only doubles the plane's potential ceiling, but also allows it to climb out from sea-level to 12,000 feet in nearly half the time.*

bocharged engine. At 18,000 feet with one prop feathered, this flight demonstrated that a single turbocharged engine is able to deliver the power necessary to hold altitude safely even over mountainous regions.

Few are driven by the need to set altitude records or fly twins long distances with one prop feathered. However, there remains a common denominator with all pilots/operators — the desire for an economical and safe way to squeeze the best performance out of their aircraft. To avoid turbulence, to go farther and faster for the same fuel consumption; these are basic demands that bring true satisfaction to most in the aviation community.

## BASIC DESIGN

All Kelly Aerospace turbochargers are built around a 3-inch diameter rotating group. The lightweight impeller and turbine wheel design results in extremely low inertia, permitting an instant response to engine speed and load changes. The short length turbine wheel and shaft (only 4 1/2 inches)

keep installation size down to a minimum (less than 7 inches from compressor inlet to turbine outlet). The average weight of the turbo is surprisingly modest with some models being only a little over 12 pounds.

Significant among the design features of the Kelly Aerospace Series turbochargers is the patented, one-piece aluminum bearing of the semi-floating design. Engine oil pressure is directed to the bearing at 30 psi with between 1 and 2 quarts per minute being supplied.

This oil pressure virtually suspends the bearing in a film of oil around the O.D., while also permitting oil to pass through radial holes to the bore.

The ends of the bearing serve as thrust surfaces in both directions. Since the oil supply to the bearing is a direct and unrestricted passage, it lends itself to rapid lubrication. If power is applied without engine warm-up, sufficient residual oil exists for initial lubrication due to the characteristics of this bearing.

This design feature has proved so durable that other turbocharger manufacturers have used it, under license, for heavy duty truck applications, where a 5,000 hour service life is quite common. Another characteristically unique feature of this turbocharger is its carbon-faced oil seal providing excellent sealing ability and also extending the life of the unit.

## TURBO NORMALIZING

Kelly Aerospace turbochargers have become original equipment on a variety of piston engine aircraft, such as the Piper Seneca, Turbo Arrow, Enstrom Helicopter, and Aerostars, as well as over 1,200 aftermarket Turbo Normalizing STC installations on normally aspirated engines.

Turbo Normalizing is an effort to restore lost power suffered while gaining altitude since power produced by a naturally aspirated engine is directly proportionate to the density of air entering its intake. For instance, the density of air at sea level is 0.0765 pounds per cubic feet. But at 10,000 feet, air density drops to 0.0565 pounds per cubic feet. So, an engine that develops 100 hp at sea level is limited to roughly 73.9 hp at 10,000 feet.

Turbo Normalizing an engine enables it to gain altitude with no appreciable loss of power. Wasted energy from exhaust gases is harnessed by rerouting those gases to a turbine wheel placed in their path. These escaping gases cause the turbine to spool up to as much as 120,000 rpm. Since the compressor impeller is attached to the turbine by means of a common shaft, the



*The driving force of the Kelly Aerospace turbocharger is the turbine wheel (left) and compressor impeller (right). It is capable of rotating up to 120,000 rpm.*

impeller rotates at the same rpm, compressing the filtered induction air being ingested by the engine.

In some installations, an automatic wastegate device is used to expel exhaust gases at sea level. The wastegate gradually inches its way toward the closed position as the plane gains altitude. As the wastegate closes, it progressively diverts more and more exhaust energy to the turbo and consequently feeds additional boost pressure to the engine.

A pressure controller positions the wastegate by means of an actuator, constantly maintaining air density to the engine and assuring no loss of horsepower. Once the aircraft reaches the altitude at which the wastegate completely closes, all exhaust gases now pass through the turbine. This is the plane's critical altitude. Above this altitude, the plane will begin to lose power because it does not possess sufficient boost to maintain sea level performance.

## MANUAL AND "FIXED" SYSTEMS

It would be appropriate to mention that other wastegate configurations are also used. The Rockwell 112TC and Enstrom Helicopter use a wastegate that is directly linked to the throttle so that as the throttle advances, the wastegate moves toward closure. Takeoff is performed at part throttle and a pressure relief valve prevents overboost.

Early wastegates were introduced as manually operated devices. In climb, as manifold pressure begins to drop, the pilot simply makes vernier adjustments manually to the wastegate to compensate for altitude changes. These systems remain both in production and use.

Another form of wastegate is the orificed or "fixed" wastegate used on some Pipers. This style of wastegate continuously allows some of the exhaust to flow through the turbo but never diverts the entire flow. As a result, it experiences a lower critical altitude. Together, these systems require little to no maintenance and will generally perform trouble free well past TBO.

## TROUBLESHOOTING

Troubleshooting is usually limited to determining the source of an oil leak. Often, the assumption is made that the turbo is at fault. This assumption can lead to both unnecessary maintenance and additional expenses. In most cases, an oil leak is not a turbo problem — rather it is caused by either improper turbo installation or poor engine maintenance. Most often, turbocharger damage is caused by contaminated lubricating oil or insufficient lubrication of the center housing assembly. Another source of turbocharger failure is caused by foreign objects entering either the compressor or turbine.

Although this scenario could be catastrophic to the health of the turbo, the airplane would merely revert to its naturally aspirated condition. However, in a ground boosted system with low compression pistons, a roughness generally accompanies this change. This roughness is due in large part to the loss of deck pressure to the fuel pump and at the injection nozzles. A seizure of the turbocharger causes the MAP to fall 2 inches below naturally aspirated condi-



### Oil Inlet

### Oil Outlet

*Cross sectional view of Kelly Aerospace Series turbocharger.*
*Note the direct unrestricted passage for oil supply to the semi-floating bearing.*

tions because of the backpressure at the turbo. At takeoff or climb, the richness caused by low atomization of the fuel through the injection nozzles can only be corrected by a leaning of the mixture.

Allowing a cooling down period for the turbo is a maintenance procedure that should be universally practiced. When taxiing in, allow the engine an additional two minutes of idle time before going to ICO. This simple practice will prevent any oil residue from coking in the hot turbine housing and

will prolong the life of the turbo.

If a scavenge pump is installed, periodically inspect hoses for integrity and check hose routing to assure there are no kinks. Any collapsing or kinking of a scavenge pump hose causes a backpressure to the turbo resulting in oil seepage past the seals of the bearing housing. Faulty, or improperly positioned check valves can also contribute to oil leakage from the bearing housing. Oil residue found in the exhaust or telltale plumes of black smoke at run-up may be indicative of oil seepage past the piston ring of the turbine wheel.

Another preventative maintenance tip that is often overlooked is related to cylinder repair work performed on the engine. Any time valve or cylinder damage has occurred, it is wise to check the condition of the turbine and housing. It is not unusual to find fragments of valve faces or stems lodged in the turbine. In the event of any potential FOD, always remove the turbine exhaust and, using a suitable light, visually inspect the turbine assembly for nicked, bent , broken, or missing blades.

Remove the turbocharger if any damage is evident. A careful troubleshooting procedure should be accomplished prior to automatically removing the turbo from the aircraft. Typical early warning signs are low manifold pressures at altitude or oil leakage evident in the air induction system or turbine outlet exhaust stack. If manifold pressure is the problem, check for turbine or impeller damage and for air leaks in the compressor discharge, the intake manifold, and the air throttle body ducting. If

## Turbocharger operation diagram



oil leakage is evident, remove the ducting to the compressor inlet and again examine the compressor wheel for blade damage or rubbing on the housing. Also check the radial play and if found to be excessive, remove the turbocharger for overhaul.

A Kelly Aerospace turbocharger is basically very simple in its design and function. This simplicity coupled with its rugged features assures a long and satisfying operating life. With consistent care and maintenance, these turbochargers will often outlast the engine. ■

*Randy Knuteson is Director of Product Support for Kelly Aerospace Power Systems in Montgomery, AL.*

### A brief history of the five manufacturers who have owned the RAJAY (Kelly Aerospace) turbocharger line:

**1958** — TRW (Thompson-Ramo-Wooldrige of Cleveland, OH) develops the 300 Series Turbocharger.

**1969** — RAJAY Industries (Long Beach, CA.), a unit of the Texstar Corp. in Grand Prairie, TX, acquires the entire TRW Turbocharger line. Texstar later became a unit of the Hillman Co. of Pittsburgh, PA.

**1982** — Roto-Master Inc. (North Hollywood, CA), later a unit of Echlin Corp. (Branford, CT) acquires the entire RAJAY Industries operation from Hillman Co., including the RAJAY STC's for aircraft kits.

**1986** — AiResearch Industrial Division of the Garrett Corporation, now AlliedSignal Automotive, acquires the entire operation of Roto-Master from Echlin Corporation and relocates it to the Garrett turbocharger facilities in Torrance, CA.

**1995** — RAJAY turbocharger STCs were divested of to Kelly Aerospace, Inc. in Montgomery, AL.

**1997** — Kelly Aerospace Power Systems (Montgomery, AL.), announces in August its purchase of the RAJAY turbocharger line from AlliedSignal. This purchase includes manufacturing, engineering, and design rights to both aircraft and automotive turbochargers.





# KELLY AEROSPACE

## *Turning Potential Into Performance*

Here at Kelly Aerospace, we are constantly expanding our product lines to meet the ever changing needs of the aviation industry. Our recent purchase of the RAJAY and Garrett turbochargers, pressure relief valves, wastegates, and controllers makes us your best source for both new and rebuilt turbocharging systems for all the general aviation aircraft flying today...even for those going straight up.

## Turbochargers, Valves & Controls

- Factory New, OEM Approved.
- Rebuilt to Factory New Tolerances.
- Performance Alloys That Resist Cracking.
- One Year Unlimited Hours Warranty.

*For more information on the new Kelly Aerospace or a listing of your nearest Kelly Aerospace Distributor, visit our website at www.kellyaerospace.com or call (877) FLY-KELLY.*



# KELLY AEROSPACE
## Power Systems

Airport Complex • PO Box 273 • Fort Deposit, AL  36032
(877) FLY-KELLY • (214) 390-1121 Fax
http://www.kellyaerospace.com
Certified Repair Station #UT2R226L



# EXHIBIT "C"



**AIRCRAFT**


☒ Hit Counter



Main Turbo Systems, Inc
234 Cotta   Visalia, CA 93292
800-847-8815   559-635-3322
559-627-1960 Fax
maints@lightspeed.net

# Airesearch and Rajay

Federal Aviation Administration Repair station #MAMR190K

🔩 **Turbochargers**   🔩 **Controllers**

🔩 **Wastegates**   🔩 **Pressure Relief Valve**

### Licensed Pilots and A & P Mechanics on Staff

We offer exchanges, overhauls, and free testing for all Turbochargers,
Controllers,  Waste gates, and Pressure Relief Valves.

# 24 HOUR WARRANTY SERVICE
# QUALITY WORK

"Sensitive to your needs"

### WE BUY TURBO CORES

⚙  **Trouble Shooting**

⚙  **Warranty**

⚙  **Company Information**

Trouble Shooting | Warranty
Company Information



Last updated on: Saturday, May 18, 2002